(18 Misc. Rep. 83.)

### PEOPLE v. PIERCE.

(Cattaraugus County Court. September, 1896.)

SENECA INDIANS—UNLAWFUL FISHING—POLICE REGULATIONS.

Laws 1895, c. 974, § 102, prohibiting the use of dynamite in any waters of the state except for mining or mechanical purposes, is a police regulation, and applies to an Indian who killed fish by exploding dynamite in the Alleghany river within the reservation of the Seneca Indians.

Appeal from justice court.

Action by the people against James Pierce for violating Laws 1895, c. 974, § 102 (Game Law), in killing fish by exploding dynamite. From a judgment of conviction, defendant appeals. Modified.

D. C. Reilly, for appellant.

G. W. Cole, for the People.

VREELAND, J. The defendant was convicted by and before a justice of the peace of the town of Salamanca of the offense of having, on the 13th of October, 1895, killed fish in the Alleghany river, in Cattaraugus county, by the explosion of dynamite, contrary to the provision of section 102, c. 974, Laws 1895. Upon such conviction the defendant was sentenced by the justice to pay a fine of $40, and, in addition, to be imprisoned for 30 days in the county jail of the county. It was substantially conceded upon the trial by defendant that he had exploded dynamite in the river for the purpose of killing fish; and by the people that defendant was a Seneca Indian, a member of the Seneca Nation of Indians, and that the particular spot in the river where the explosive had been used was upon the Alleghany Indian reservation. Upon this statement of facts the defendant asked to be exempted before the justice from liability to the provisions of the statute cited, and upon this appeal makes the broad claim that, since he is a Seneca Indian, and the alleged offense was committed upon the reservation which his tribe occupies, therefore the legislature of the state of New York has no authority or jurisdiction over the reservation or its waters; that it cannot control or restrict the right of himself or his people to take fish from this river in any manner they choose to adopt; and, for these reasons, the act referred to is invalid and void, so far as he is concerned.

These Indians have possessed the right to occupy these lands from a time in the past "whereof the memory of man runneth

not to the contrary," and the story of such right, and of their rela-
tions to the United States and the state of New York, has been
often told. In 1628–1629, the king then ruling England granted to
the colony of Massachusetts Bay, in America, certain lands de-
scribed, in the quaint language of the day, as follows:

"All that parte of Newe Englande in America which lyes and extendes
between a greate river there commonlie called Monomack, alias Merriemack,
and a certain other river there called Charles river, being in the bottome of
a certayne bay there commonlie called Massachusetts, alias Mattachusetts,
alias Massatusetts bay, and also all and singular those lands and heredita-
ments whatsoever, lying within the space of three English myles on the south
part of the said Charles river, and also the landes lyeing and being within
three English myles to the southward of the southmost part of the saide bay.
And also all those landes and hereditaments whatsoever which lye and be
within the space of three English myles to the northward of the saide river
called Monomack. And all landes and hereditaments whatsoever, lyeing with-
in the lymits aforesaide, north and south in latitude, and in length and longi-
tude, of and within all the breadth aforesaide, throughout the mayne landes
there, from the Atlantic and westerne sea and ocean on the east parte, to the
south sea on the west parte."

On March 12, 1664, the king then ruling England granted to his
brother, Duke of York, certain other lands "of Newe Englande."
Out of the latter grant was carved the colony, and later the state,
of New York, and from the former grant were formed the colony
and state of Massachusetts. During the long years embracing
the French and Indian wars and the period of the Revolution, no
notice appears to have been taken of the fact that the grant to the
duke overlapped the earlier grant, but, when the affairs of the colo-
nies began to take more definite shape after the treaty of Paris,
the colony of Massachusetts took steps to locate the boundaries
of their grant, mapped the same as extending between parallels 42
degrees to 45 degrees, from the Atlantic to the Pacific, and laid
claim to almost the whole of the state of New York, not actually
settled. New York resisted the claim, and a convention between
the two states was held at Hartford, in the colony of Connecticut,
in 1786, where, on December 16th of that year, a stipulation was
signed by Rufus King and three others for Massachusetts, and by
Robert R. Livingston and five others for New York, establishing
a line across the state north and south from the Pennsylvania
boundary, commencing at the southeast corner of Steuben county,
running along the westerly shore of Seneca Lake, and terminating
in Sodus Bay on Lake Ontario. New York ceded to Massachu-
setts "the right of pre-emption of the soil from the native Indians,
and all their estate, right, title, and property (the right and title
of government, sovereignty, and jurisdiction excepted) which the
state of New York hath" in the territory lying on the west of the
line marked; and Massachusetts ceded to New York "all the claim,
right, and title which the commonwealth of Massachusetts hath
to the government, sovereignty, and jurisdiction" of the lands in
question. Under the authority reserved in this stipulation the
state of New York has assumed to extend its laws over all this land
once claimed by Massachusetts, and has enacted, and now seeks

to enforce, the act in question, as against the tribe of Indians, still occupying a portion of the original tract.

It seems reasonably clear that this may be done. The words chosen—"government, sovereignty, and jurisdiction"—are among the broadest in the language. "Government" is "the exercise of authority in the administration of the affairs of a state, community, or society; the authoritative direction and restraint, exercised over the actions of men in communities, societies or states." Cent. Dict. "Sovereignty" is "the supreme, absolute, uncontrollable power by which any state is governed." Cooley, Const. Lim. p. 3. "Jurisdiction" is "controlling authority; the right of making or enforcing laws or regulations, the capacity of determining rules of action or use, and exacting penalties; the function or capacity of judging or governing in general; the inherent power of decision or control." Cent. Dict. These definitions certainly cover the case under consideration. It is not the purpose of the statute to absolutely prohibit the taking of fish from the waters of the state, but to regulate and control such taking, and to prevent the wholesale destruction of this important food product. This fish law is the result of years of study and experience in the nature and habits of the finny tribe, with a view to prevent their destruction, and to promote, to the greatest extent, their growth and increase. Its purpose is as much for the welfare of these Indians as for that of their white neighbors. Experience has taught that, unless the methods of taking fish can be controlled, and the season for taking them regulated so as not to interfere with their propagation, all the fish in the waters of the state are doomed to destruction. Such a result would be more disastrous to the interests of the Indians, and be more quickly and keenly felt by them, than by the whites.

To confine the question, however, to the exact point at issue, it does not appear that the slaughter of fish by the explosion of dynamite in their native waters is "fishing," within any fair interpretation of the term. By this means large numbers of fish are destroyed, and only a few are secured. Young and old alike are killed. Their habits of breeding and taking food are disturbed and interfered with. Under these conditions, it is clear that the provisions of this law are wise and just, and ought to be upheld and enforced.

The claim of the defendant that the terms of this statute are hostile to existing statutes of the United States, or to the stipulations contained in the treaties heretofore made with this tribe of Indians, is not tenable. So far as I can discover, the United States has never enacted by its congress any statute, or given out any decision by its courts, in opposition to the right of the state of New York to exercise its "sovereignty" over these lands. The relations of the United States with these Indians began soon after the close of the Revolution, when a treaty was held, whereby the government "gave peace" to these Indians, and "secured and confirmed" them "in the possession of their lands." Beyond this, excepting to supervise their dealings with the whites, the general government

has done nothing. The claim is made by defendant that the United States expressly guarantied to his nation the right to fish without interference in these waters, by express treaty, but such does not appear to be the case. The only reference to their right to fish and hunt appears to be contained in the deed executed by the nation to Robert Morris in 1797, made under the supervision of the general government, whereby all the vast tract comprising western New York was conveyed to him, and in which the right to hunt and fish in the lands conveyed was reserved. Under this provision, the right of the Indians over the waters in question is in no way superior to their rights in all the other streams embraced in the lands so conveyed. It is not likely that any express treaty was necessary to entitle them to the reasonable use of the waters for fishing, but the fact cited does prove that they have no such exclusive authority over this river as to entitle them to defy the "sovereignty" of the state of New York, when exercised with reason and judgment, over the same. The Indians, themselves, have also invoked the "sovereignty" of the state upon repeated occasions. As early as 1813 laws were enacted by the state to prevent trespasses upon their lands by white persons, and these laws have been frequently amended, and extended in scope, and their aid invoked by the tribe. The very corporate existence of the Seneca Nation itself depends upon a statute of the state. The statutes forbidding trespasses upon their lands by whites, and providing for the removal of intruders, have been upheld as a police regulation (People v. Dibble, 16 N. Y. 203), and it seems plain that the present law may be sustained upon the same ground.

The case has been considered at greater length than the precise question involved demands, but, in view of the surroundings, it has seemed advisable to ascertain the result to which an examination of the whole question might lead. Such examination leads me to the conclusion that the state of New York has the authority to make and to enforce these laws, and that Indians are amenable to their provisions in the same manner and to the same extent as are the whites. The sentence imposed by the justice was a fine of $40 and imprisonment in the county jail for 30 days, and was apparently imposed under the general provisions of the statute regulating punishment for misdemeanors. Section 102, under which the prosecution was conducted, provides the punishment, which may be imprisonment for not less than 30 days, but does not authorize a fine.

The judgment of conviction must, therefore, be modified by remitting the fine, and, as so modified, the judgment of conviction and the sentence affirmed. Ordered accordingly.