[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 205 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 206 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 207 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 208 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 209 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 210 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 211 
The proceedings which are to be reëxamined upon this appeal were brought into the Supreme Court by a common law certiorari,
directed to Edgar C. Dibble, county judge of the county of Genesee. No other question, I apprehend, is open to examination but that of the jurisdiction of the officer before whom they were had.
I decline to consider whether Ogden and Fellows obtained a good title to the lands known as the Tonawanda reservation, under the grant to them, and the treaties of January 15, 1838, and of May 20, 1842; because I think the rights of the relators to occupy the lands in controversy may be disposed of upon other grounds.
We encounter, in limine, the relators' objection, that the act of the 31st March, 1821, respecting intrusions on Indian *Page 212 
lands, is in violation of rights secured to individual citizens under the first, second and sixth sections of article one of the constitution. The act declares "It shall be unlawful for any person or persons, other than Indians, to settle or reside upon any lands belonging to or owned by any nation or tribe of Indians within the state; and that all leases, contracts and agreements made by any Indians, whereby any person or persons, other than Indians, shall be permitted to reside upon such lands, shall be void." It then provides for the summary removal of intruders upon such Indian lands by a judge's warrant, to be executed by the sheriff of the county where such lands are situate. It is thought that the summary removal of persons who have entered upon these lands is against those provisions which secure the trial by jury, and forbid the deprivation of property and of rights and privileges secured to the citizens of the state, unless by the law of the land, the judgment of their peers, and the due process of law referred to in the first, second and sixth sections of the first article. The argument is, that the possession of lands isprima facie a right of property, of which the party cannot be deprived except by a trial by jury and the judgment of a court of competent jurisdiction proceeding after the course of the common law. Did the Indians maintain the same relations to the government as the white citizens of the state, and were their right to the occupation and enjoyment of their lands held by the same tenure and to be enforced by the same remedies as the rights of property of the citizens generally, there would be some force in the objection; but it is quite otherwise. The Indians are not citizens of the state, in the exact sense of that term. They have been treated, since our first intercourse with them, as quasi
independent nations or tribes, having governments and institutions and national attributes of their own; but, both collectively and individually, feeble and helpless compared with the whites, and therefore needing constantly the protection and paternal care of the government. Their rights of property in their *Page 213 
lands rise no higher than the right of occupancy, which it has been the constant care of the government never to disturb, unless with their consent, and then only under regulations of justice and humanity. The policy has been to prevent individual citizens from acquiring any title to and from entering upon and appropriating their lands, unless by such means and under such regulations as the government chose to prescribe. A rule which would authorize individual citizens to obtain possession of their lands, under any claim or pretence whatever, without the sanction of the government, and put them or it to the slow and tedious process of an action at law to recover it back again, would be destructive of their rights and subversive of the duties and obligations which the government owes them. The citizen who enters upon their lands, before their title has been extinguished and they have been removed by the act or approbation of the government, acquires no such rights of property or possession as are contemplated by the sections of the constitution referred to. He must be regarded as a trespasser and an intruder, subject to removal by summary proceedings in the same manner as he would be from the public domain or other property of the state. The fourth section of the act in regard to the sovereignty and jurisdiction of the state declares that if any person, under any pretence whatever, shall intrude upon any of the waste or ungranted lands of the state, it shall be the duty of the district attorney of the county to report the same to the governor, who shall thereupon, by a written order, direct the sheriff to remove such intruder; and section five makes it the duty of the sheriff to execute such order, and, in case of resistance made or threatened, he may call to his aid the power of the county, as in case of resistance to the writs of the people. This right of summary removal is indispensably necessary to the protection of its own property, and to enable the state to fulfill its duties and obligations to the remnants of the Indian tribes within its borders, who are too feeble and helpless to protect themselves. *Page 214 
It is under no constitutional or other obligation to wait the judicial determination of the courts to remove intruders from what are indisputably the ungranted lands of the state, or the reservations of the Indian tribes. The moment the intrusion is made out, and the nature of the territory intruded upon appears, there is nothing to be tried, and nothing for the courts to determine, in respect to the right of occupancy and possession. Besides, the order of removal adjudicates upon no claim, and determines no right or title, but leaves the party removed to the usual remedies to assert and establish any title to the locus inquo which he may deem himself to possess.
By the treaty, made between the United States and the Six Nations of Indians, of the 11th of November, 1794, certain lands in western New-York, including the Tonawanda reservation (the premises in dispute), are declared to be the property of the Seneca nation; and the United States therein stipulated and declared that "they will never claim the same, nor disturb the Seneca nation, nor any of the Six Nations, or their Indian friends residing thereon and united with them, in the free use and enjoyment thereof; but it shall remain theirs until they choose to sell the same to the people of the United States, who have the right to purchase." By an arrangement made between the States of New-York and Massachusetts (who mutually claimed jurisdiction over and the preëmptive right to these lands), as early as 1786, the sovereignty and jurisdiction became vested in the first named state, while the right of preëmption to the soil from the Indians passed to the last named state, who granted it, by proper conveyances, to Thomas L. Ogden and Joseph Fellows, under whose title the relators entered. The conveyance from those who professed to be the chiefs and head men of the Seneca nation of Indians was incorporated into and became a part of the treaty of May 20th, 1842. The fourth article, amongst other things, provided that arbitrators should be appointed to determine and *Page 215 
award the amount of money to be paid to each individual Indian for the value of the improvements upon the two tracts called the Buffalo Creek reservation and the Tonawanda reservation, and that the report of the arbitrators, after being proved in duplicate, should be filed, one part in the office of the secretary of the war department, and the other part thereof delivered to Ogden and Fellows. By the fifth article, the amount so ascertained and awarded should, on the surrender and delivery of the possession, be paid to the President of the United States, to be distributed amongst the owners of such improvements. The effect of these several stipulations came before this court for adjudication, inBlacksmith v. Fellows (3 Seld., 401), and the following propositions were therein affirmed: First. That the lands known as the Tonawanda reservation were Indian lands, of which the Tonawanda Indians had the right of occupancy by force of the fourth, fifth and seventh articles of the treaty of May 20, 1842. Second. That the individual Indians could not be deprived of the possession until the amount they were entitled to receive for improvements should be determined by the judgment and award of the arbitrators mentioned in the fourth article. Third. That the making of such determination and award, and filing the same in the department of the secretary of war, was a condition precedent to the right of entry, by Ogden and Fellows, upon the lands of the reservation. The result of the several resolutions adopted by this court, in Blacksmith v. Fellows, is to declare that the deed, from those professing to be the chiefs and head men of the Seneca nation to Ogden and Fellows, does not operate to vest in the grantees any right of entry upon the lands therein granted, until the condition precedent contained in the deed is executed and performed.
The return to the writ of certiorari shows that the lands, from which the relators were removed as intruders, are a part of the identical lands known as the Tonawanda reservation; and it nowhere appears, nor was it pretended, that *Page 216 
the award and determination provided for by the fourth article of the treaty had been made and filed, as therein intended. The relators had entered upon the lands under the title of Ogden and Fellows, without the authority of the government, and before the Indians had been removed therefrom under its observation and orders. The case of Blacksmith v. Fellows is decisive, therefore, against the claim of the relators to enter upon and occupy the lands at present.
There is another question in the case entitled to a passing notice. The means resorted to by the relators to obtain the possession of the lands is that known to the law as remedy by the mere act of the party. They undertook to determine for themselves some of the most material and weighty questions involved in the execution of the treaty, and by an entry upon the lands, without process of law or an order from the government, to assume that the Indian right of occupancy was extinguished. Our laws and policy regulating intercourse with the Indian tribes are hostile to anything of the kind. If these people were left free to deal with the whites, as the white population deal with one another, the advantage would all be on the side of the latter. Such commerce could result in nothing less than the speedy extinguishment of every Indian right, and the immediate reduction of the Indian people to want and suffering. Their inability and utter incapacity to deal with the superior knowledge and sagacity of the whites is a recognized fact in our policy, and they have constantly occupied towards the government the same relations of pupilage and subjection that children and wards occupy towards their parents and guardians. The designation of a tract of land west of the Mississippi as a permanent home for the New-York Indians, and to which they were to be removed; the provisions of the fifth article of the treaty of 1842, for the payment to the government of the consideration money for the release and conveyance of their lands, and the sum awarded as the *Page 217 
value of the improvements on surrender of their possessions; the settled and uniform usage of the government, are indicative of an intention that the removal of the Indians and the surrender of their possessions were to be effected under the observation and direction of the government of the United States.
The case of Blacksmith v. Fellows was removed into the Supreme Court of the United States, and there reviewed and affirmed. (19 How. U.S.R., 366.) The following paragraph from the opinion of Mr. Justice NELSON embodies the rule of law as well as the rule of action which has hitherto guided the government in its intercourse with the Indian tribes: "We think, therefore, that the grantees derived no power, under the treaty, to dispossess by force these Indians, nor right of entry, so as to sustain an ejectment in a court of law; that no private remedy of this nature was contemplated by the treaty; and that a forcible removal must be made, if made at all, under the direction of the United States; that this interpretation is in accordance with the usages and practice of the government in providing for the removal of Indian tribes from their ancient possessions, with the fitness and propriety of the thing itself, and with the fair import of the language of the several articles bearing on the subject."
The judgment and proceedings should be confirmed.
COMSTOCK, PAIGE, SHANKLAND and BOWEN, JS., concurred in this opinion, as did DENIO, Ch. J., and JOHNSON, J., in respect to the constitutionality of the act of 1821; DENIO, Ch. J., and JOHNSON, J., dissented, however, on other grounds; the former delivering the following opinion.