In the Matter of HENRY A. FISCHER, JR., as District Attorney of Franklin County, on Behalf of CHIEFS OF ST. REGIS MOHAWK TRIBE OF INDIANS, Appellant. MICHAEL CHECKMAN, Respondent.

Third Department, March 24, 1954.

*Arthur B. Hart* for Andrew Bero and others, as Chiefs of the St. Regis Mohawk Tribe of Indians.

*Main, Pond & Main* for respondent.

BERGAN, J. The respondent Michael Checkman is a white man and is the husband of Minnie Grey Checkman, a member of the St. Regis Mohawk Tribe of Indians. The husband and wife have been residing together on lands in the St. Regis Indian Reservation in Franklin County. The lands on which they live are owned by the wife.

On December 17, 1952, the clerk of the St. Regis Mohawk Tribe addressed a formal communication to the District Attorney of Franklin County. The communication was brief and pointed. It stated: " Will you please notify Mr. Mike Chekman a white man who is residing on the reservation to move off same. He has been verbally notified to move off the reservation." The communication was signed and approved by three chiefs of the tribe. Their authority to act as chiefs is conceded.

The duty of a District Attorney when he receives such a communication as this rests on a statutory direction. He is required to institute a judicial proceeding before the County Judge of the county in which the Indian lands are located to remove the intruder (Indian Law, § 8). The statute is mandatory in this respect. Upon " the written application of a majority of the chiefs " of the tribe the District Attorney " shall make complaint of any intrusions on such lands, and cause the intruders to be removed."

Who is an " intruder " in the sense of the special statutory use of that word in this section is not left to rest on mere general meaning. It is given a contextual definition. The section heading describes the section as " *Intrusions on tribal lands* " but what is intended to be meant by " intrusion " becomes immediately apparent from the opening words of prohibition. " No person ", it reads, shall " settle or reside " on any lands owned

or occupied "by any nation, tribe or band" of Indians except "the members of such nation, tribe or band".

This language makes the legislative intent explicit. It is the person not a member of the respective Indian unit who undertakes to reside on the lands who becomes an "intruder." It is such a person the District Attorney is required to proceed against to remove on the application of the proper Indian authorities; and it is such a person the County Judge is required to order removed. These are the "intrusions" for which the statutory proceedings are framed.

If the Judge is satisfied that the person is not a member of the Indian unit involved, his duty to order his removal is mandatory. He "shall" issue his warrant accordingly to the Sheriff. The only area of open judicial inquiry lies in the right to determine whether or not there is membership in the Indian unit. There is no room left for residual judicial discretion.

The individual or private Indian owner of land has no right to permit a person other than a member of the Indian unit to settle or reside on his land. The words "owned or occupied by" used in connection with "tribe" or "nation" or "band", suggest that the ownership and occupation there intended to be described was in the sense of a general sovereign or public Indian occupation of lands which might also be held in private Indian title or ownership. The sovereignty of Indian units of government for some purposes has long been recognized in New York to have continued on the reservations. (*Matter of Patterson* v. *Council of Seneca Nation*, 245 N. Y. 433.) (Cf. *People ex rel. Cutler* v. *Dibble*, 16 N. Y. 203.)

That the prohibition against nonmembers of an Indian tribe or other appropriate Indian unit settling or residing on tribal or other unit lands placed it beyond the legal right of members of the tribe privately owning land to allow by contractual arrangement nonmembers to reside on the land becomes clear when the statute is read further. Any lease, or "contract" or "agreement" which permits "such residence" shall be "void".

The Indian woman had the right, of course, to contract a marriage with the white man. Section 3 of the same statute provides that in "the capacity to contract" marriage, the laws of New York relating to that subject are applicable to Indians. But the section also preserves some Indian matrimonial customs and the jurisdiction of enumerated Indian tribunals in matrimonial matters is preserved.

Neither by the contract of marriage nor by other form of contract had Minnie Grey the right to permit her husband to reside on the lands within the jurisdiction of the Indian tribe. The husband, therefore, had the legal right to marry the Indian but not to live with her on an Indian reservation.

That a husband may not usually be regarded as an " intruder " on lands of his wife in the sense in which the word " intruder " is commonly employed is true enough; but in the use this statute makes of the word he falls literally within a class of persons described in plain statutory language if he is not a member of the tribe; and it is clear from this record that his marriage does not make this respondent a member of the St. Regis Mohawk Tribe.

The policy of the law is, of course, to encourage husbands and wives to live together; but the restrictions upon non-Indians living on Indian reservations must necessarily have been known to the respondent when he chose to marry an Indian woman and there is no compelling reason demonstrated in this record why they cannot live elsewhere.

A married person does not necessarily find admissible welcome in every place his spouse may be entitled to go. Diversities of citizenship, of rank, of training, or occupation all suggest themselves as examples of places where one might be admitted and the other excluded, as well, of course, as the diversity of sex itself.

If cross-marriages brought with them a general right to white persons to live on Indian reservations the distinctiveness and the separation of Indian nations and tribes which has been preserved by a long and deliberately conceived public policy would be diluted; and to say that is to say they would be destroyed. Another and related aspect of the result of white pressure upon Indian lands in its impact on public policy was considered in the opinion of Brown, J., in *People ex rel. Cutler* v. *Dibble* (*supra*, p. 216). The residence by one claiming it from the contractual arrangement inherent in a marriage comes in conflict with a manifest public policy of this State as we view that policy.

In *Matter of Stakel* (*Blueye*) (281 App. Div. 183, affd. 306 N. Y. 679), a case dealing with this subject considered in the Fourth Department in 1953, the court was satisfied on the record before it that the respondent, who was an Indian woman, was a member of the Tonawanda Nation by her ancestry. (Indian Law, § 40.) In these circumstances it was held she did not come

within the prohibition of the statute on residence on a Tonawanda Reservation. Since it was not shown to the satisfaction of the court that Blueye was not a member of the Tonawanda Nation, although that question was in dispute, the order of the County Judge removing her was reversed. There is a good discussion of some aspects of the general problem in *Matter of Woodin* v. *Seeley* (141 Misc. 207, affd. 238 App. Div. 766).

We think that the St. Regis Tribe was entitled to have the order of removal sought on its behalf by the District Attorney.

The order should be reversed and the application granted. without costs.

FOSTER, P. J., COON, HALPERN and IMRIE, JJ., concur.

Order reversed and the application granted, without costs. The facts as found by the County Court are affirmed.