In the Matter of District Attorney of Suffolk County, Petitioner. Great Cove Realty Co., Inc., et al., Respondents.

County Court, Suffolk County, January 17, 1955.

*Harry C. Brenner, District Attorney (Henry Tasker* of counsel), petitioner in person.

*Morris Permut* for Great Cove Realty Co., Inc., and another, respondents.

*William H. Kinn* for Devonshire Construction Corp., respondent.

*Joseph V. McKee* and *John C. O'Malley* for Realty Associates, respondent.

*Sidney L. Mitchell* for Monarch Power & Heating Co. and others, respondents.

*David Du Vivier* for Trustees of the Shinnecock Indian Tribe.

HAZLETON, Acting County Judge. In this proceeding brought by the District Attorney of Suffolk County as petitioner, under section 8 of the Indian Law, petitioner seeks to oust respondents as intruders upon the lands of the Shinnecock tribe, whose reservation is located in the town of Southampton.

By chapter 46 of the Laws of 1859, the trustees of the tribe were empowered to convey to the trustees of the lands of the Town of Southampton, all their interest in certain lands generally known as Shinnecock Hills and Sebonnack Neck lying north of a certain line commencing at the head of the creek and running along the Indian ditch, where a fence then stood, to the Stephen Post meadow, thence along the old ditch on the south side of said meadow to the old Fort Pond. And the trustees of the lands of the Town of Southampton in turn were authorized to receive such conveyance from the Indians in consideration of a deed conveying to the trustees of the Indians in behalf of the Shinnecock tribe, all the land commonly called Shinnecock Neck, lying south of the before-described line, commencing at the head of the creek on the east side of said neck, and running along the Indian ditch, where the fence at that time stood, to the Stephen Post meadow; thence along the old ditch on the south side of said meadow to old Fort Pond. The statute states that "The true intent and meaning of this act is, and it shall be construed to be, to enable the said Shinnecock tribe of Indians to exchange all their rights in and to the land north of said line, for a full release to them by said trustees of said proprietors, of all their rights in and to all land south of said line".

The preamble to the statute recited that the Shinnecock tribe was in occupation of attractive land called Shinnecock Neck by virtue of a lease; that the tribe lived on the land, had rights of pasturage, and that the rights of the tribe and the trustees were in conflict and causing frequent and expensive litigation. It was also stated that a verbal agreement and arrangement had been entered into between the tribe and the trustees for the full release, each to the other of all their rights on either side

of an established line to the end that each might improve and own in severalty all the lands on their side of the line. Conveyances accordingly were executed and exchanged.

In May of 1954, one of the respondents, the Great Cove Realty Company, entered upon a triangular parcel of land of about nine acres, located at the northwesterly end of the reservation, prepared same for development, and has in part constructed a number of homes. This was done according to Charles Smith, a trustee of the tribe, after he had warned a representative of the Great Cove Realty Company that the land was part of the Shinnecock Reservation.

The question presented is "Where was the old Indian Ditch mentioned in the legislation of 1859 located when the above conveyances were exchanged?" The petitioner and the Shinnecock tribe contend that the ditch ran along the southerly shoulder of an old sand road that is now Montauk Highway. The respondents claim the ditch was of sufficient distance to the south of the highway, so as to include the tract under consideration.

Two rulings must be made upon certain evidence. The petitioner submitted declarations made by people who are now dead, as to what they said was the location of the old ditch that is the northern boundary of the reservation. Such evidence is known as reputation evidence and may be received under certain circumstances when the evidence relates to matters of public or community interest. Proof of actual knowledge upon the part of the declarant is not necessary when the declarations relate to matters of public interest because all persons are presumed to have knowledge of public matters. However, when the testimony relates to matters of only general or community interest, as in this proceeding, then there is no presumption of knowledge, so that such knowledge by the declarant must be proven. I am of the opinion that from all the surrounding circumstances, it clearly appears and has been proven that declarants had such knowledge. I therefore deny respondents' motion to strike such testimony from the record.

A letter was written by an attorney for the trustees of the tribe, which trustees are now deceased. This letter and its reply were offered in evidence by respondents, and objected to by petitioner upon the grounds that the contents of the letters constituted a privileged communication between the trustees and their attorney. It appears that the attorney had been retained not to give professional advice, but rather as a representative to negotiate for the tribe in the purchase at a nominal

price of the triangular parcel in question, and that the attorney had been authorized to transmit to others what was said in the letters. It may have been that since the parcel first came into existence by conveyance as an entity in itself in 1925, and had been the subject of various conveyances since that time, the tribe was endeavoring to clear up the question of title by purchase at a nominal price for the reason that Indians are circumscribed and restricted by statute as to when they may sue or be sued. I do not know; but in any event, the trustees were not asking the attorney for professional advice, but rather to represent them in negotiations to acquire the land. This in itself indicates that neither the conversations between the attorney and the trustees, nor the letters were privileged. See *Avery* v. *Lee* (117 App. Div. 244) where almost precisely the same facts that exist here were before the court. Since the communication made by the trustees was not intended for the attorney alone, but by its very nature was to be disclosed to third parties, the privilege arising out of the relationship of attorney and client does not apply. (Richardson on Evidence [7th ed.], § 486.) Both the conversation and the letters therefore are accordingly admitted in evidence.

Typical of much of the testimony offered by respondents was that of Mr. Edward A. Howell, president of the First National Bank of Southampton, who testified that he had lived near the reservation for eighty years, and was familiar with it since he was seven or eight years of age. He said Montauk Highway was first a dirt road, and the old Indian ditch ran along the southern shoulder of the highway; that a fence was in the ditch; that the ditch was a marker for the boundary of the reservation; that he never saw a ditch on the north side of the highway, and that he last saw the fence about forty or fifty years ago. This witness also clearly identified the Stephen Post meadow mentioned in the legislation of 1859 and referred to in the two conveyances exchanged in accordance therewith.

Charles Smith, a thirty-six-year-old trustee of the tribe, testified that when he was sixteen years of age, he saw two ditches, about nine feet apart, about sixty-five to seventy feet south of the highway at the westerly end of the reservation, and that these ditches ran on a slant about two hundred feet upward into the southerly side of the highway, which at that time was an improved road. What this witness related ties in with the evidence of Timothy Downs, which I will later comment upon.

One Augustus Raynor, seventy years of age, who has been acquainted with the reservation and its people since boyhood

recalled that he hauled gravel for the construction job, and distinctly remembered the old ditch running along the southerly side of the highway. He considered the ditch to be the northerly boundary of the reservation, and had been told so by a trustee of the tribe, whom he identified. This witness said there were quite a few other ditches inside the reservation, which recollection is similar to that of others.

The highlight of this entire proceeding was the evidence of Timothy Downs, now in the late winter of his life, who was so crippled by the infirmities of old age, that his testimony had to be taken at his home in Greenport. Downs clearly recalled the old ditch running along the southerly side of the old sand road from a point at the east beginning about three hundred feet from the town line, and then running westerly the entire length of the reservation.

He was absolutely certain the ditch was the northerly boundary of the reservation. He related how he had worked as a checker on the construction job when Montauk Highway had its first hard surface laid; that the engineers ran their line along the ditch, that north of the ditch was town land, and south of the ditch was Indian land. That the hard surface put on was twelve or fifteen feet wide; that the road was only a one-strip road; that the workers had to keep the concrete about ten feet north of the boundary ditch of the Indian reservation, thus leaving a dirt shoulder between the newly laid hard highway and the old ditch. He said that at the westerly end of the reservation, the ditch ran down because of a swail, which point in his testimony agrees with that of Charles Smith, the trustee of the tribe, who testified that about two hundred feet of the old ditch, which slanted away from the highway, was still a visible line until destroyed by defendants when they entered upon the land. This old gentleman was blessed with a clear recollection, sound mind and memory and when he told his story undoubtedly was at peace with God and man.

Montauk Highway is no longer a narrow one-strip road, but has a wide hard surface with shoulders on the sides. It is reasonable to assume, and I am satisfied that the ditch recalled by Mr. Downs was destroyed thereafter by the widening and modernizing of the highway. The swail is still there just as he said. From the testimony of these witnesses standing alone, although the old ditch became obscure because of the sands of time and the march of man, it would seem that the old ditch ran along the southerly line of the Montauk Highway until it slanted off at the west as testified to by the witness Smith.

The evidence offered by the respondents consisted mostly of maps, surveys and testimony of two surveyors, one of whom had certified to the correctness of the survey of the property which is the subject of this inquiry, and Robert Hubbard, who recalled he had seen many yards of topsoil taken from the land without any interference by the tribe. However, the surveyor who made this certified survey, had acquired the plant of one Wallace R. Halsey, who had been a surveyor for many years in the town of Southampton. This same Halsey also had made a survey of School District No. 6, which beyond a doubt showed that the northerly boundary of the Shinnecock Reservation, where the questionable property lies, is the southerly line of Montauk Highway, and that the nine-acre tract is part of the Shinnecock Reservation. It is highly significant that this survey was made in 1921, before the questioned parcel came into existence of record in 1925, as a separate entity, and in my mind is a true survey. Some witnesses produced by respondents said they saw the old ditch and other ditches, and that part of the old ditch still remains obvious. However, what they described as the old ditch, I believe, from the evidence, to be just another ditch with which the reservation is lined in several places. What they saw could not have been the old ditch referred to in chapter 46 of the Laws of 1859 because that old Indian ditch had already been obliterated by the modernizing of Montauk Highway.

Since it appeared to be certain that this trial would be a long and expensive one to both the county and respondents, this court, before the taking of testimony, inquired whether any question would be raised in respect to the procedure taken by the petitioner or the jurisdiction of this court, whereupon all parties-respondent assured this court there would be no such question raised. In the stipulation entered into in open court before the trial, this appears: "The Court: Now, there is not going to be raised here, I take it, any point involving the question of whether or not the procedure pursued by the District Attorney is the proper procedure, is that correct?

MR. PERMUT: No question on that.

MR. O'MALLEY: No.

The Court: Because I don't want to waste a lot of time and money taking proof, and then have a question of jurisdiction or a procedural question raised. If such a question were to be raised, I would pass upon that as we do in the Surrogate's Court, preliminarily, and then move on to the matter of substance.

MR. PERMUT: There is no question on that score on behalf of my defendants [respondents]."

Nevertheless, in spite of what they unquestionably had agreed to, respondents, after the close of this case, moved to dismiss the proceeding upon the ground that the court lacked jurisdiction. In the event respondents had chosen to change their position anent jurisdiction after they had consented to same, they should have done so at the earliest possible time, and not have waited until the taking of testimony had ended. Such a stratagem fails utterly to impress this court.

It is well-settled law that an Indian tribe may not sue or be sued without express statutory authority. (*King* v. *Warner*, N. Y. L. J., June 22, 1953, p. 2085, col. 5.) Such express statutory authority for the present proceeding is section 8 of the Indian Law. Take it away from them, and the Indians would have no relief against the intrusion of which they here complain. It is the sole and only remedy afforded to Indians to protect " any lands owned or occupied " by them against intrusions.

The status of Indians is succinctly stated in *People ex rel. Cutler* v. *Dibble* (16 N. Y. 203) at pages 212, 213:

" The Indians are not citizens of the state, in the exact sense of that term. They have been treated, since our first intercourse with them, as *quasi* independent nations or tribes, having governments and institutions and national attributes of their own; but, both collectively and individually, feeble and helpless compared with the whites, and therefore needing constantly the protection and paternal care of the government. * * * ·

" A rule which would authorize individual citizens to obtain possession of their lands, under any claim or pretense whatever, without the sanction of the government, and put them or it to the slow and tedious process of an action at law to recover it back again, would be destructive of their rights and subversive of the duties and obligations which the government owes them."

The motion to dismiss the petition is denied; judgment as prayed for by the petitioner is granted, and it is directed that a warrant of removal be issued to the Sheriff of the County of Suffolk commanding him to remove the respondents from the lands described in the petition.