Ormand N. Gale, J.
The Onondaga Council of Chiefs have *524 requested the removal of certain non-Indians from the Onondaga Territory. The request was initiated on February 3, 1975 by a letter to the Honorable Wallace H. Johnson, Assistant Attorny-General in Washington, D.C. That letter starts out as follows: "Pursuant to the Canandaigua Treaty of 1794, and to our original request of July 2, 1974 and August 19, 1974, we ask you to take appropriate actions to maintain the removal of non-Indians from the Onondaga Territory effected by the Onondaga Nation pursuant to our Houdenosaunee Laws, Customs, and Usage.” The Attorney-General referred the matter to the Department of the Interior for action.
Thereafter, and on March 17, 1975 the United States Department of the Interior through the office of the Solicitor referred the case to Jon K. Holcombe, District Attorney of Onondaga County. In this letter to Mr. Holcombe it was suggested that section 8 of the Indian Law of the State of New York be followed to maintain the removal of the non-Indians. On March 31, 1975 the Six Nations Council of Chiefs by Chief Gordon Peters as secretary wrote to Dr. Theodore Marrs, Special Assistant to the President in Washington, D.C. advising that the Interior Department’s notice to proceed under section 8 of the Indian Law was incorrect. Again referring to Chief Powless’ letter of February 3, 1975 Mr. Peters stated on page 1:
"Pursuant to the Canandaigua Treaty of 1794, and to our original requests of July 2, 1974, and August 19, 1974, we ask you to take appropriate actions to maintain the removal of non-Indians from the Onondaga Territory * * *
"You are authorized to request the District Attorney of Onondaga County to take necessary means to remove these non-Indians, if the United States so decides.”
On page 2 of this same letter Chief Peters said as follows: "It should not be inferred that the Onondaga Council of Chiefs is requesting that any particular procedure be used by the United States or State of New York, the method to be used to maintain the removal is within the discretion of the United States so long as treaty provisions are complied with.”
The foregoing correspondence is all attached to Exhibit 7 received in evidence at the hearing before this court. This was forwarded to the Honorable Albert Orenstein, then one. of the County Judges of Onondaga County by Reid P. Chambers, Associate Solicitor, Division of Indian Affairs. It is quite clear that from an analysis of this exhibit that the United States *525 envisioned the procedure set forth in the fourth sentence of section 8 of the New York Indian Law.
Much of the background to these proceedings is contained in Judge Burke’s decision People v Cook (81 Misc 2d 235).
In analyzing the history of this type of situation, it is quite obvious to this court, as it was to Judge Burke, that the Indians were jealously guarding their rights under various treaties with the United States of America, and in particular the Treaty of Canandaigua (Nov. 11, 1794) and they were not about to take any action on their own in the courts of the State of New York which could possibly jeapordize any of their treaty relations. Judge Burke in his decision cites Williams v Lee (358 US 217) wherein he quotes from the Lee case: "that as a result of conquests and treaties the Indians were induced to give up complete independence in exchange for Federal protection, aid and grants of land.” (People v Cook, supra, p 317.)
Based on the above this court concluded on February 7, 1977 that the Onondaga Nation had proceeded to seek relief by calling upon the United States of America to take such actions as they saw fit and they rejected the direct application to the District Attorney of Onondaga County. Solicitor Reid P. Chambers, in his letter of June 25, 1975, agrees with this conclusion. In that letter he stated on page 2: "District Attorney Holcombe thereafter requested the Chiefs to sign a petition apparently to invoke the action by his office contem-. plated by the ninth sentence of Section 8 of the New York Indian Law. This appears from the enclosed copy of the letter of March 31, 1975, from Chief Gordon Peters, Secretary of the Six Nations Council of Chiefs, to Dr. Theodore Marrs, Special Assistant to the President. Upon receiving a copy of the letter to Dr. Marrs, which indicated that the Chiefs felt that they could not sign the suggested petition, we sought alternative methods of assisting the council. The possible use of the procedures described in the fourth sentence of Section 8 of the New York Indian Law was suggested, and it is for that purpose that we are writing to you.”
Solicitor Chambers then reviewing again some of the correspondence concluded that there had been a substantial compliance with the provisions of the fourth sentence of section 8 of the New York Indian Law, concerning the making of a complaint of a violation of that section. Solicitor Chambers reaffirmed this in his letter of August 13, 1975, to the Honorable *526 Albert Orenstein wherein he stated as follows: "We now understand that this letter, constituting the renewed request of the council for the removal of the alleged trespassers, will be sufficient as a petition for the institution of appropriate proceedings for such removal. I believe the petition is valid as presented and I request that you proceed forthwith.” (Italics the writer’s.)
It is the ruling of the court which I made from the Bench on February 7, 1977, that this court agrees with Solicitor Chambers in that the complaint of the petitioner is properly before this court.
In connection with the jurisdictional issue it should be noted that Mrs. Woodrow Johnson, Jr., was never served in this proceeding and is therefore not a party to the action nor affected by the decision.
Turning to the merits of the petition for removal, it is first noted that respondents Dimmler, Okun and Crane are spouses of Onondaga Indians, and have made their homes on Onondaga territorial lands for many years with the permission and/or acquiescence of the Council of Chiefs. Each has testified to having built his house on land cleared with his own hands. The product and accumulations of their adult lives are inextricably bound to the land on which they live, and there is no practical way to liquidate their investment in the property and establish comparable homes elsewhere. Another of the respondents, Mrs. Elliot Honyoust, is actually an Indian, although not a member of the Onondaga Nation. She is one of an estimated 200 such Indians presently residing on the reservation. She, too, has lived on the reservation a great many years.
Certainly in the case at bar none of the respondents forced their way upon the Onondaga Reservation without leave or welcome. The record is replete with evidence that these respondents talked to one or more of the chiefs, then in authority, and received permission to live on the reservation.
This court can fully understand that the Council of Chiefs wants the reservation, from generation to generation, to consist of full-blooded Indians, and not to have the line of descent "watered down” by the influx of white persons. However, to single out families like the Dimmlers, the Honyousts, and the Cranes who are in their sixties and who have resided on the reservation for many years is unjust and unfair. The problem *527 of dilution of the Onondagas is manifestly remote with these respondents.
In 1952 our Fourth Department of the Appellate Division spoke to this matter in the case of Matter of Stakel (Blueye) (281 App Div 183, affd 306 NY 679). In that case they stated as follows at pages 184-185: "The appellant did not force her way upon the Tonawanda Reservation without leave or welcome. Her father, Frank Parker, was a member of the Tonawanda band or nation. He married her mother, Jemima Williams, who was a Seneca Indian living in Canada. Carrie Parker (Blueye) was born in 1889 and when about six years of age, the family came to the Tonawanda Reservation where they continued to live since 1895 * * * While appellant never asked for or received a permit to dwell on the reservation, nor was she on the Tonawanda Reservation roll for Government benefits, yet for nearly sixty years she has had no other home, but as the daughter and the wife of Tonawanda Indians, has been and remained on the Tonawanda lands, not as an intruder thereon but with the tacit approval and acquiescence of the Chiefs Council and all others.”
The appellant in the Stakel case is no different from these respondents. They, likewise, have remained on the reservation lands for a number of years.
It is additionally urged upon the court by the respondents that the relief sought by petitioners is prohibited by the Indian Civil Rights Act (US Code, tit 25, § 1302), which states in part: "No Indian tribe in exercising powers of self-government shall * * * (5) take any private property for a public use without just compensation * * * (8) deny to any person within its jurisdiction the equal protection of its laws or deprive any person of liberty or property without due process of law; (9) pass any bill of attainder or ex post facto law” The Indian Civil Rights Act, passed in 1968, applies to the activities of tribal governments certain restrictions which are essentially derived from the Bill of Rights of the United States Constitution. Contrary to the assertions of the District Attorney, the rights enumerated in the act apply equally to non-Indian residents. (See Dodge v Nakai, 298 F Supp 17, wherein the exclusion of a non-Indian attorney from the Navaho Reservation was held to constitute a cause of action under the Indian Civil Rights Act; see, also, Schantz v White Lightning, 502 F2d 67, 70; and Hickey v Crow Creek Housing Auth., 379 F Supp 1002, 1003.) The District Attorney’s further objections to the *528 applicability of the Indian Civil Rights Act on grounds that the Onondagas have never been defeated in battle, or alternately that the District Attorney is not an Indian, are not well founded.
In Martinez v Santa Clara Pueblo (402 F Supp 5), the court recognized the need to weigh and evaluate individual rights under the Indian Civil Rights Act as against the tribal interest in autonomy and preservation of traditional Indian culture. It was held in that case that a Santa Clara ordinance discriminating against ,the female offspring of mixed marriages was violative of the Indian Civil Rights Act. The court noted that the tribal ordinance in question was of recent origin and had been selectively applied, so that it did not represent a deep-seated tradition of the Pueblo. Furthermore, it did not effectuate tribal purity and was merely an arbitrary and expedient solution to certain problems confronting the tribe.
The reasoning in Martinez (supra) is clearly applicable to the case before this court. That is, it was not until March of 1974 that the Council of Chiefs allegedly decided to evict as "intruders” the individuals later named in this petition. Referring again to the Stakel case (supra, p 184) the court stated as follows: "The issue presented in a proceeding under [section 8 of the Indian Law] is whether a person is an 'intruder’. * * * The Indian Law does not define 'intruder’ nor has any witness in this case told what an intruder is. 'Intrude’ is defined as 'to force (oneself) in without leave or welcome’. An intruder is said to be 'one who in any way thrusts himself in where he is not wanted’ (Webster’s New International Dictionary [2d ed.].) The appellant did not force her way upon the Tonawanda Reservation without leave or welcome.”
Certainly with respect to those persons who had been allowed to reside upon the reservation as long as 40 years, that related decision cannot be said to reflect a "venerable tradition” of the Onondaga Nation, but on the contrary would fit squarely within the concepts of the Stakel case.
A ban restricted to non-Indian newcomers would do as much to deter mixed marriages or preserve tribal integrity without inflicting the severe economic losses which threaten these respondents. As for Mrs. Honyoust, the effect of her presence upon the reservation is no different than that of the 200 other non-Onondaga Indians living there.
In Dodge v Nakai (298 F Supp 26, 31, supra) the court notes *529 that "Due process requires governmental entities to utilize reasonable means in seeking to achieve legitimate ends”. Applying that test, it cannot be said in this case that summary ejectment of respondents Dimmler, Okun, Crane and Honyoust by way of section 8 of the Indian Law, or otherwise, is a reasonable means to any legitimate end. The attempt to evict those particular individuals and thereby deprive them of homes, the bulk of their personal property and their financial security is violative of the Indian Civil Rights Act in several respects.
There is no out-and-out taking of property without compensation, because the Indian spouse may continue to own the land, but after 40 years of apparent matrimonial happiness, it is not likely that the white spouse and the Indian mate will separate. This means, the only solution is to sell the land to an Onondaga.
The laws of supply. and demand and ability to pay apply. Louella Derrick, the Indian Agent for the Onondagas, testified that she pays each Onondaga (p 11) $2,430 per year and orders salt for them from the Government. It can readily be seen that the buyers’ market is relatively nil. The action represents, in effect, a taking of private property without compensation; a denial of due process and the application of an ex post facto law. With respect to Mrs. Honyoust, it also represents invidious discrimination and a denial of equal protection under the law. Such serious deprivations of constitutional rights far outweigh any claims of tribal custom or principle which could be made under this particular set of facts.
As a separate and alternate basis for the denial of the petition herein, respondents Dimmler, Okun, Crane and Dorsey have additionally taken issue with the designation "intruder” on the ground that each legally resides upon the Onondaga Indian Reservation by virtue of a valid lease, as contemplated by section 24 of the Indian Law of the State of New York. That law states in part: "An Indian residing on the Onondaga reservation and a member of the Onondaga tribe, owning or possessed of improved lands therein, may lease such lands to white persons, for a term not to exceed ten years”.
The above respondents have submitted to the court written leases signed by the respective Indian owners or possessors of the land upon which they reside. The District Attorney is of the opinion that such leases are a contrivance of New York *530 State law, and cannot stand against tribal laws and custom. However, there has been no proof offered that the concept of a private lease is contrary to tribal laws. Section 24 of the Indian Law applies solely to the Onondaga Nation and has been in existence since 1873, and its spirit has been challenged only as of 1974. This court has no other facts upon which to base its decision. Furthermore, the proceeding now before this court is just as much a contrivance of New York State law, and one which the Onondaga Chiefs have expressed to be contrary to their laws and customs. Under the circumstances it would be unjustifiable to enforce section 8 of the Indian Law and arbitrarily refuse to enforce section 24, which is equally applicable to this case.
This issue points up the difficulty inherent in any attempt to administer the ancient Indian Law of New York State, at least insofar as the Onondaga Nation is involved. That is, the Onondagas do not recognize the State government or its courts and laws, and will deal only with the Federal Government and its agencies. Therefore, although the New York Indian Law may well need revision so as to reflect the present principles and goals of the Onondaga Nation, such revision would require an interaction between the Indians and the State which is presently ruled out by the farmer’s own laws and customs. Similarly, in actions such as the one at bar, the court is hampered by the unavailability of any direct testimony from the Council of Chiefs as to just what tribal customs and traditions conflict with New York . Indian Law. It would seem that some compromise must be reached so as to avoid the costly and frustrating proceedings that result from any attempt by our State courts to administer to the needs of the Onondagas under these circumstances.
Based upon the foregoing decision the relief sought by petitioner is denied as to respondents Dimmler, Okun, Crane and Honyoust, on the ground that it would be violative of their rights under section 1302 of title 25 of the United States Code. Relief is denied as to respondents Dimmler, Okun, Crane and Dorsey on the further ground that pursuant to section 24 of the Indian Law they may reside legally upon the Onondaga Reservation for a period of 10 years from the date of the leases which they have obtained.
The remaining respondents, Chapman, White, Muck, Edwards, and Wheelock, have elected to offer no testimony or other evidence as to their situation, and instead seek dismissal *531 on the ground thay they have moved off the reservation since being served in this action. This court is of the opinion that such a ruling would lead to circumvention of section 8 of the Indian Law by the simple expedient of a temporary move. Section 8 contains added sanctions in the event of a second removal thereunder and, the Onondaga Nation is entitled to the full benefit of that provision. Therefore, in the absence of any proof to the contrary, it is determined that respondents Chapman, White, Muck, Edwards and Wheelock are intruders upon the lands of the Onondagas within the meaning of section 8 of the New York Indian Law, and are subject to removal pursuant to that law. The relief sought is granted to the extent indicated, and otherwise denied.