46

[883 NE2d 344, 853 NYS2d 520]

In the Matter of Thomas J. Spota, District Attorney of Suffolk County, on Behalf of the Unkechaug Indian Nation, Appellant, v Tina Jackson, Respondent.

Argued January 2, 2008; decided February 7, 2008

### POINTS OF COUNSEL

*Thomas J. Spota, District Attorney,* Riverhead (*Karla Lato* of counsel), for appellant. The hearing court exceeded its discretion in determining respondent was not an intruder under Indian Law § 8. (*Merrion v Jicarilla Apache Tribe,* 455 US 130; *Santa Clara Pueblo v Martinez,* 436 US 49; *Matter of Grogan v Cook,* 48 AD2d 713; *Matter of Patterson v Seneca Nation,* 245 NY 433; *Matter of Woodin [Seeley],* 141 Misc 207, *affd sub nom. Matter of Woodin,* 238 App Div 766; *Matter of Holcombe v Dimmler,* 55 AD2d 808; *Ortiz-Barraza v United States,* 512 F2d 1176; *Matter of Fischer [Checkman],* 283 App Div 518; *Matter of Catterson v Pell,* 249 AD2d 387; *Matter of Hennessy v Dimmler,* 90 Misc 2d 523.)

*Nassau/Suffolk Law Services Committee, Inc.,* Riverhead (*Meridith Nadler, Jeffrey Seigel* and *Hannah Abrams* of counsel), for respondent. I. The lower court correctly held that respondent was not an intruder under section 8 of the Indian Law. (*Matter of District Attorney of Suffolk County v Nelson,* 68 Misc 2d 614; *Matter of Catterson v Pell,* 249 AD2d 387; *Matter of Grogan v Cook,* 48 AD2d 713; *Matter of Hennessy v Dimmler,* 90 Misc 2d 523; *Matter of Stakel [Blueye],* 281 App Div 183, 306 NY 679; *Matter of Fischer v Tebo,* 9 AD2d 470; *Matter of Fischer [Checkman],* 283 App Div 518; *People v Dibble,* 16 NY 203; *Merrion v Jicarilla Apache Tribe,* 455 US 130; *Santa Clara Pueblo v Martinez,* 436 US 49.) II. New York State public policy preventing violence against persons applies to a woman who received court protection against her abusive husband. (*Matter of Stakel [Blueye],* 306 NY 679.)

### OPINION OF THE COURT

Chief Judge KAYE.

The question before us is whether Indian Law § 8 granted the County Court the discretion to determine, independent of the Indian nation, that respondent, Tina Jackson, was not an "intruder" upon tribal land. We conclude that the court did not have that discretion.

In the 1980s, George Jackson (the husband), a blood-right member of the Unkechaug Indian Nation, received an allotment of land located at 165 Poospatuck Lane on the Poospatuck

Indian reservation.[1] In 1985 he moved to the allotment with his wife, respondent Tina Jackson (the wife), a non-Indian non-tribal member, and their three sons, George Jr., Timothy and Mohammad. Under the Poospatuck tribal bylaws, she was permitted to reside on the allotment by derivative right as the spouse of a member who exercised his right to reside on an allotment on the reservation. The couple lived on the reservation between 1985 and 1988 and then moved off of the reservation for approximately 14 years.

In August 2002, the family returned to 165 Poospatuck Lane. With the assistance of the Unkechaug Tribal Council and the tribe, and at her expense, the wife substituted a trailer for her family to live in on the allotment. During the winter of 2003, she reported an instance of spousal abuse to the tribe. That same year, while the wife continued to reside on the allotment with her husband and their three sons, she took him to court to obtain child support, and had his wages garnished. In January 2004, she obtained an order of protection against him from Family Court. He moved out in early February 2004.

On February 25, 2004, after he had left the family residence, the husband effected a transfer of his interest in the allotment to his brother Glenn, who then requested a meeting with the Tribal Council to discuss "getting Tina Jackson off of my land [a]s soon as possible." On April 12, 2005, Glenn officially asked the Council to remove the wife from the property. In early May, two Trustees of the Council by letter demanded that she vacate

---

1. The Unkechaug Nation, also known as the Poospatuck Indian Nation, is recognized by the State of New York (see Indian Law, art 10, §§ 150-153 ["The Poospatuck (Unkechauge) Indian Nation"]). For the Unkechaug, the right of occupancy on an allotment remains collectively with the tribe but must be granted to individual blood-right members unless they have been convicted of a crime, violated Poospatuck law, or deemed undesirable by a majority of tribal members (see Poospatuck Indian Nation Tribal Rules, Customs and Regulations).

The reasons why the tribe is not also federally recognized are discussed in the Report of Special Committee to Investigate the Indian Problem of the State of New York, Appointed by the Assembly of 1888, Transmitted to the Legislature February 1, 1889 (Whipple Report) (at 54-55; New York Indians, Hearings before a Subcommittee of the Committee on Interior and Insular Affairs on S. 1683, S. 1686, S. 1687, 80th Cong, 2d Sess, at 217 [1948]; Report with Respect to the House Resolution Authorizing the Committee on Interior and Insular Affairs to Conduct an Investigation of the Bureau of Indian Affairs, HR Rep 2503, 82d Cong, 2d Sess, at 531, 593 [1952]; see also Gerald Gunther, Governmental Power and New York Indian Lands—A Reassessment of a Persistent Problem of Federal-State Relations, 8 Buff L Rev 1, 22 n 130 [1958-1959]).

the property by June 2, 2005, or be subject to prosecution as an intruder. After she failed to leave voluntarily, six out of seven Council members authorized the District Attorney to initiate removal proceedings against her, and the present proceeding ensued.

County Court, after a hearing, concluded that although deference must be given by courts to Indian tribes, "the cases . . . make clear that courts must make a legal determination, independent of the Indian nation, as to whether or not a person is an intruder" (2005 NY Slip Op 30198[U], *2). Quoting *Matter of Hennessy v Dimmler* (90 Misc 2d 523, 526 [Onondaga County Ct 1977]), the court found that "persons who had resided on the reservation for many years were not intruders since they did not force their way onto the reservation 'without leave or welcome' " (*id.*). The wife, it determined, was such a person. Moreover, as finding her an intruder "would be ordering a separation of the mother and her three sons," then 18, 19 and 24 (*id.* at *3), and under New York law the right of support extended until a child reached the age of 21, the court concluded that her right to reside upon the allotment would continue as long as one of her blood-right member children under 21 years of age resided on the allotment. (The Jacksons' youngest child will turn 21 in September 2008.) The Appellate Division unanimously affirmed. We now reverse.

## Analysis

Titled "Intrusions on tribal lands," Indian Law § 8 provides:

> "Except as otherwise provided by law, no person shall settle or reside . . . upon any lands owned or occupied by any nation, tribe or band of Indians, except the members of such nation, tribe or band. . . . Any lease, contract or agreement in violation of this section shall be void. The county judge . . . upon complaint made to him, of a violation of this section, shall . . . take proof of the facts alleged in the complaint, and shall determine whether such person is an intruder upon the lands of such reservation."

This appeal asks us to decide the scope of the directive that the county judge "shall determine whether such person is an intruder." To resolve this open issue, we have examined the relevant statutes and case law, and have considered their implications with regard to the tribes' inherent rights as quasi-

sovereign nations. We are persuaded that Indian Law § 8 was not intended to afford a court the broad discretion that was exercised here.

While not defining "intruder" in *People ex rel. Cutler v Dibble* (16 NY 203 [1857])—our sole case interpreting Indian Law § 8[2]— we determined that the section (then L 1821, ch 204) was an enforcement mechanism, and thus provided no margin for judicial discretion. The 1821 statute—titled "An Act respecting Intrusions on Indian Lands"—did not actually use the term "intruder," but prohibited residence or settlement by "any person or persons, other than Indians" (L 1821, ch 204, § 1). We concluded that as part of the state's "duties and obligations" to protect the tribes within its borders, the proceeding was intended to allow "summary removal of persons who have entered upon [Indian] lands" (16 NY at 212). "The moment the intrusion is made out, and the nature of the territory intruded upon appears, there is nothing to be tried, and nothing for the courts to determine, in respect to the right of occupancy and possession" (*id.* at 214). The United States Supreme Court affirmed (*New York ex rel. Cutler v Dibble*, 21 How [62 US] 366, 370 [1858] [the law was a "police regulation" intended to protect the bands "from imposition and intrusion"]).

In 1892, the various Indian laws respecting "intrusions" were consolidated. The directive to the county judge was incorporated (from an 1863 law [L 1863, ch 90] prohibiting nonmembers of the Tonowanda Band of Seneca Indians from residing or settling on the Tonowanda reservation), and an exception added for "as otherwise provided by law" (*see* L 1892, ch 679, adding Indian Law § 8). Although reenacted as Indian Law § 8 in 1909, amended in 1955 and again in 1957 to add, in relevant part, "in violation of this section" after "[a]ny lease, contract or agreement" the statute's current form is otherwise unchanged from 1892 (*see* L 1892, ch 679; L 1909, ch 31; L 1955, ch 400; L 1957, ch 886).

In the 1950s, the Third and Fourth Departments of the Appellate Division divided as to the scope of discretion Indian Law § 8 allowed the county judge (*see Matter of Stakel [Blueye]*, 281

---

**2.** *People ex rel. Blacksmith v Tracy* (1 Denio 617 [1845]) determined that the decision of a county judge cannot be reviewed by mandamus, and in *People ex rel. Waldron v Soper* (7 NY 428 [1852]), we held that the court was without jurisdiction where defendants were summoned and did not appear before the county judge. Neither, however, actually interpreted the section.

App Div 183 [4th Dept 1953]; *Matter of Fischer [Checkman]*, 283 App Div 518 [3d Dept 1954]).

In *Stakel (Blueye)*, Carrie Blueye was the daughter of a Tonawanda tribal member who had married a Seneca woman. Although lineage was determined through the mother's bloodlines, Carrie Blueye had married a Tonawanda member and lived on the reservation for nearly 60 years. The tribe instituted removal proceedings after her husband died. Even assuming that the custom was to trace nationality through the maternal side, the court concluded that Carrie Blueye was not an "intruder." Finding no definition of intruder in the statute or the evidence, the court relied on the dictionary: "An intruder is said to be 'one who in any way thrusts himself in where he is not wanted'. (Webster's New International Dictionary [2d ed.].) The appellant did not force her way upon the Tonawanda Reservation without leave or welcome" (*Stakel [Blueye]*, 281 App Div at 184). In affirming, this Court chose not to adopt the Appellate Division's reasoning, relying instead on Indian Law § 9 and on evidence that written permission to reside on the reservation had been granted Carrie Blueye's mother (*see Matter of Stakel [Blueye]*, 306 NY 679, 680 [1954]).[3]

In *Fischer (Checkman)*, a majority of the tribal chiefs of the St. Regis Tribe of Mohawk Indians applied to the District Attorney for removal of a non-Indian married to a tribal member. Distinguishing *Stakel (Blueye)*, the court determined that "[t]he only area of open judicial inquiry lies in the right to determine whether or not there is membership in the Indian unit. There is no room left for residual judicial discretion" (*Fischer [Checkman]*, 283 App Div at 520). As the Third Department noted,

> "Who is an 'intruder' in the sense of the special statutory use of that word in this section is not left to rest on mere general meaning. It is given a contextual definition. The section heading describes the section as 'Intrusions on tribal lands' but what is intended to be meant by 'intrusion' becomes immediately apparent from the opening words of prohibition. 'No person', it reads, shall 'settle or reside' on any lands owned or occupied 'by any nation, tribe

---

3. This definition of "intruder"—considering circumstances surrounding a person's relations with the tribe, in addition to membership or the tribe's own characterization of status—was, however, thereafter adopted as the applicable test by at least one court—Onondaga County Court in *Matter of Hennessy v Dimmler* (90 Misc 2d 523 [1977]).

or band' of Indians except 'the members of such nation, tribe or band'.

"This language makes the legislative intent explicit. It is the person not a member of the respective Indian unit who undertakes to reside on the lands who becomes an 'intruder.' It is such a person the District Attorney is required to proceed against to remove on the application of the proper Indian authorities; and it is such a person the County Judge is required to order removed. These are the 'intrusions' for which the statutory proceedings are framed" (*id.* at 519-520).

We agree with the court's reasoning in *Fischer (Checkman)*. In the first instance, a statutory term should be defined by the context of the statute rather than by the dictionary (*see Rosner v Metropolitan Prop. & Liab. Ins. Co.*, 96 NY2d 475, 479 [2001]). Indian Law § 8 makes clear that an "intruder" is a person not a member of the subject tribe who undertakes to reside on tribal lands.

From 1788, when the term "intruder" first appeared in treaties with the Onondagas and Oneidas, each section that used the term specified in its opening sentence the persons it covered (*see* Treaty with the Onondagas [intruder is "any person" except the Onondagas who had "come to reside or settle" on Onondaga lands[4]]; L 1821, ch 204 ["any person or persons, other than Indians" who "settle or reside upon lands belonging to or occupied by any nation or tribe of Indians"]; L 1863, ch 90, § 25 ["any Indians, other than members of the Tonawanda band"]; L 1892, ch 679, § 8 ["person(s)" who "shall settle or reside upon any lands owned . . . by any nation, tribe or band of Indians" except for its own members]).

Although the language directing that the county judge "determine whether such person is an intruder upon the lands of such reservation" was added in 1892, we conclude that it was not intended to alter the scope of the court's discretion, which was still limited to the opening definition. This conclusion is supported by the clause, present in each version, that "[a]ny lease, contract or agreement . . . shall be void," as such language would be meaningless if the tribe could, by its actions,

---

4. Treaty with the Onondagas, Sept. 12, 1788, in Whipple Report at 190, 191; *see also* Treaty with the Oneidas, Sept. 22, 1788, in Whipple Report at 237, 239).

"agree" to accept an outsider and change such person's status as an "intruder." It is further supported by the clause added in 1957, "in violation of this section," necessarily referring back to the opening sentence of "this section." The alternative *Stakel (Blueye)* test ignores the statute's own definition.

The definition would, moreover, be inconsistent with the sovereignty retained by the tribes.

Indian tribes are "unique aggregations" possessing whatever "attributes of sovereignty over both their members and their territory" have not been implicitly divested by their dependent status, including the right to "self-government and territorial management" (*see United States v Mazurie*, 419 US 544, 557 [1975]; *Merrion v Jicarilla Apache Tribe*, 455 US 130, 137 [1982]; *see e.g. Worcester v Georgia*, 6 Pet [31 US] 515, 580 [1832]). Essential to this retained right to "self-government and territorial management" is tribes' power to make their own law on internal matters (*see Santa Clara Pueblo v Martinez*, 436 US 49, 55 [1978]), the right to determine membership (*Roff v Burney*, 168 US 218, 222 [1897]) and conversely, the "right to exclude" nonmembers from Indian lands (*see Merrion*, 455 US 130, 144, 185 [1982]). The right to exclude necessarily includes the "lesser power to place conditions on entry, on continued presence, or on reservation conduct" (*Merrion*, 455 US at 144).

Since at least 1843, New York has acknowledged the customs and laws of many tribal governments, including the Poospatuck, in its statutes (*see* Indian Law §§ 20-153; *People ex rel. La Forte v Rubin*, 98 NYS 787, 788-789 [Sup Ct, Onondaga County 1905]). In *Matter of Patterson v Seneca Nation* (245 NY 433 [1927]), we held that the question of tribal membership "must be determined by the self-governing Seneca Nation, through its council, according to Seneca laws, usages and customs" (*id.* at 446).

> "[U]nless the last vestige of separate national life has been withdrawn from the Indian tribes by encroaching State legislation; then, surely, it must follow that the Seneca Nation of Indians has retained for itself that prerequisite to their self-preservation and integrity as a nation, the right to determine by whom its membership shall be constituted" (*id.* at 438).

New York courts have also generally recognized that tribal law, usages and customs not only control tribal membership but

also impact their ability to determine a nonmember's status as an "intruder" (see *Matter of Woodin [Seeley]*, 141 Misc 207 [Chautauqua County Ct 1931] [family of deceased son of member of Seneca tribe who married a non-Indian had no right of inheritance pursuant to Seneca law and were subject to removal as intruders]; *Matter of District Attorney of Suffolk County v Nelson*, 68 Misc 2d 614, 618-619 [Suffolk County Ct 1972] [adopted daughter of member of Poospatuck Nation did not become a member pursuant to tribal bylaw, therefore she and her husband were intruders upon the reservation]; *Tuscarora Nation of Indians v Swanson*, 108 Misc 2d 429, 432 [Sup Ct, Niagara County 1981] [tribal member and non-Indian husband "(we)re intruders upon plaintiff's lands as they have not shown any right to remain there, either under the tribal laws of the Tuscarora or the Onondaga Nations"]). The tribes' right to make internal substantive law, and to determine their own membership according to such law, is diminished if county courts have the discretion independently to decide who is an "intruder" on Indian lands.

In sum, Indian Law § 8 defines intruders as "non-members" who "settle or reside" within the boundaries of recognized Indian land. As there is no dispute that Tina Jackson is not a member of the Poospatuck Nation and resides on a reservation allotment, she is an "intruder" within the meaning of section 8.[5] However unwise the application for her removal may appear to this Court, the tribe did not abrogate its own bylaws, usages and customs in determining that, following the transfer, she has no right to reside on the allotment, and County Court was therefore without discretion to dismiss the petition.

Accordingly, the order of the Appellate Division should be reversed, without costs, the petition granted, respondent declared to be an intruder on the lands of the Unkechaug Indian Nation, and the matter remitted to County Court for further proceedings in accordance with this opinion.

Judges CIPARICK, GRAFFEO, READ, SMITH, PIGOTT and JONES concur.

Order reversed, etc.

---

5. We note that the wife's status as an "intruder" has no bearing on her ownership of the trailer, allegedly purchased with her own funds.